1. ejectment by a purchaser at sheriff's sale, against one claiming by a ferent title, the record of the judgment under which the land was sold by the sheriff, is admissible in evidence for the plaintiff.

2. In ejectment founded on an improvement right to certain land which was alleged to be bounded by the land of certain other persons, it was *held*, that the warrants and surveys to those persons, were admissible to prove those boundaries.

3. In ejectment by a purchaser at a sheriff's sale, where it was proved that the sheriff's deed was lost, and the levy did not specify distinctly the land levied on, it was *held*, that parol evidence was admissible to show what land was levied on and sold.

4. In ejectment, where the plaintiff claimed under a sheriff's sale of the land, as the property of A. and B. and a deed from the sheriff to C., and the defendants claimed part of the land under a deed from B. who continued on the land after the sheriff's sale; and the question was as to the particular land sold by the sheriff, in respect to which the testimony of B. had been taken by the defendants, it was *held*, that a deposition of A. containing among other things, declarations of B. respecting the land sold at the sheriff's sale, was admissible for the plaintiff.

5. In ejectment for land sold as the property of A. and B., in October, 1818, where it became a material question whether A. resided on the land at that time or not, and evidence had been given to show that he left the county a year before, and that an execution had been issued against him in November 1818, it was *held*, that the execution itself was admissible in evidence.

6. If the right of a person holding an improvement be transferred by a sheriff's sale under a judgment against such person, such right cannot afterwards be the foundation of a warrant and survey for the same land.

7. One who has a valid subsisting right to land by improvement, and who is disseised, or in any way loses possession, may maintain ejectment, and recover not only that part of the land which he has cleared, but also the uncultivated part within the ascertained boundaries of his claim.

WRIT of error to the Court of Common Pleas of [] County, to remove the record of an action of ejectment br by Anthony F. Miller, against Joh[] [], Samuel Brooke, a[] John Drehr, impleaded with Jam[] [] Cresson[] and Joseph Cresson (as to each of w[] *est inventus*,) and John Hirst, and s[] sion, to recover "a certain tract of la[] township, in the county of Schuylkill, co[] [*251] 76 perches, and allowance, &c.; bo[] by lands late of Jacob Merkle, decease[] Davies and others; on the south by the Sharp [] land surveyed to John Keller, late John Kershner, de[] the west, by lands of the plaintiff, of which the above[]

(Schall *v.* Miller.)

and on the north by lands surveyed to George Taylor, now, or late of Jacob Keim."

In pursuance of an act of assembly, the cause was removed from the Common Pleas, of Schuylkill county, in which it originated, to the Court of Lehigh county, and came on for trial before Banks, President, on the 15th of February, 1837.

The plaintiff claimed under a sheriff's sale of the land in question in the year 1818, as the property of one Levi Blew, who was alleged to have gained a title to it by improvement; and also under a warrant to him dated the 25th April, 1835.

The defendants claimed under the same improvement right, and a warrant dated 4th of August, 1824, to John Schall, for 120 acres, as for vacant land; a survey on this warrant of 195 acres, dated the 9th of September, 1824, and a patent for the same, dated the 7th of April, 1825.

A great deal of evidence, both written and parol, was given on each side, and testimony offered, and admitted or rejected, in respect to which exceptions were taken. As the general features of the case, and the particular points which were the subject of exception, are sufficiently stated in the charge of the Court below, and the opinion of Judge Huston, in this Court, it is not deemed necessary to give an abstract of the evidence in this place.

The counsel for the defendants requested the Court to charge the jury on the following points.

1. "A warrant, survey, and patent, having been issued on Levi Blew's improvement, no second warrant could legally issue on the same improvement and settlement right, and therefore, the warrant of the plaintiff is void.

2. If the jury believe on the evidence, that there is more than four hundred acres of land in one body, and whereon the improvement and settlement under which the plaintiff claims title was made, on which he may at any time lawfully locate his warrant without interfering with any part of the land in question in this suit, the plaintiff cannot recover without a survey made on the ground; and a survey may be made without attaching it to all the adjoiners called for in the warrant.

*3. Anthony F. Mill⸺⸺ ⸺g purchased an imperfect title founded u⸺ ⸺t only, stands in the situation of ⸺ ⸺ affected by all his acts affecting the title ⸺ ⸺e purchased when the vendor is out of ⸺ ⸺othing for the title purchased.   [*252]

⸺or the Levi Blew improvement, and for the ⸺uestion having issued, and the title from the ⸺the Cressons, having been recorded prior to the plaintiff's warrant in 1835, he is affected with notice

(Schall *v.* Miller.)

at that time, that he could acquire no title to the land in question under his warrant.

5. If the jury believe that the paper given in evidence, dated the 11th day of May, 1829, was signed and sworn to by James Blew, and accompanied the title papers from Crosby to John Schall and Thomas S. Ridgway, and from them to the Cressons, for the fifty-two acres and one hundred and twenty-nine perches; the plaintiff, who stands in no better situation than James Blew, cannot recover. And if the jury believe that James Blew disclaimed or concealed his title in any other manner at the time Crosby and Levi called upon him in 1829, for the purpose of ascertaining whether the heirs of John Blew claimed title to the improvement, he is now estopped from setting up any title he then may have held. The plaintiff, under the evidence, stands in his shoes and he cannot recover.

6. If James Blew did purchase the improvement land in 1818, and neither himself nor Anthony F. Miller claiming under him, took any step to perfect the improvement right, and during all that time suffered Levi Blew and those claiming under him to be in the possession, and in 1825 or '6 Levi had a survey made circumscribing the improvement lands, excluding the land in question, and the title to that improvement was afterwards perfected under Levi Blew's improvement by official survey and patent from the commonwealth in 1829, and still excluding the land in question—the plaintiff cannot now extend the boundaries of that improvement-right beyond the boundaries of the patent thus obtained.

7. The Cressons are *bona fide* purchasers of a good and legal title upon the face of it, for a valuable consideration, and are not affected by any secret agreements or acts, of which they had no notice.

8. If the jury believe that James Blew, under whom the plaintiff claims to hold, was not in the possession of the improvement for a period of seven years before the 25th January, 1830, the time of the purchase by the Cressons under the patent from John Schall [*253] and *Thomas S. Ridgway, it is an abandonment in law of his right under the improvement—more especially as it does not appear under the evid    that the plaintiff has ever been in the possession of any par          vement on the land in question."

The Court charged in substance as fo

"It appears from the evidence, that old large tract of land from a man by the name as the year 1804; that when he came to have h off by survey, a part of the land was supposed to another right, and that part was thrown out of his su

(Schall *v.* Miller.)

person who made the survey at this time, told old John Blew and his sons, that this part might possibly be held by improvement, and expressed a doubt as to the validity of the right by which it was claimed. The land thus thrown out, was north of what has been called· the mortgage line, and which has been so often pointed out to you on the plots exhibited. The sons of old John Blew did go on this strip, then thrown out of his close by their father, to hold the same by improvement ; this is proved by Michael and Levi Blew, if you think them entitled to belief. That they did go on the land is testified to by others. Levi commenced an improvement on the east end, Michael in the middle, and young John Blew on the west end. The old man, it is stated by the witnesses, was moved on Levi's improvement, in the year 1808, where he died the next year. Old John Blew had, in his lifetime, conveyed to his sons Michael and Levi, the land he had purchased of Moyer ; from this time Michael and Levi claimed all the land, as well that claimed by purchase from Moyer, as the strip on the north of it claimed by improvement. It turned out that Moyer had no right to the land he sold to old John Blew ; this is a point agreed upon by both parties. In or about the year 1810, James Blew agreed with his brothers Michael and Levi to build a saw-mill on the land. He was to build the mill and pay $100, and was to have the one-third of the land, and to receive one-third of the profits of the saw-mill ; James testifies that he did build the saw-mill and pay the $100, but that he did not receive the one-third of the profits. Other witnesses testify to the fact that the saw-mill was built by James. About this time, it is testified, that Michael and Levi became indebted to a man named Price, in the sum of $500. Price wanted the money, which they were unable to pay. Price agreed to give time to them, if they would give him security for the debt. They prevailed on James to go their security, and agreed to give him all their land if he had the debt to pay. James testifies that he had to pay the debt. Levi also testifies that James did pay the debt. Some short time after this, Michael and Levi sold the land to one Hughes. The sale purported to be a sale of all their lands. Hughes paid them $400. Hughes became doubtful of the *title, and the contract, by consent of all, was rescinded, and Michael and Levi agreed to repay to Hughes the money which he had paid them. They gave John Adams as bail for the payment. Suit was afterwards brought against the [defendants for] this money to December term, 1817, in favour of [Hughes] ; and judgment was obtained against all the defendants by default on the 19th of February, 1818. A *fi. fa.* was issued on this judgment, for a debt of $410. A levy was made on the land, but it was not described in the levy ; an inquisition

[*254]

(Schall *v.* Miller.)

was held on the land, in which there is a description. The land is described as adjoining Klouser's, and also calls for the land shown by the plots exhibited to adjoin this land on the east. The land thus levied on was sold on a *venditioni exponas* to James Blew, for $70 50, and the sheriff executed and delivered to him a deed for the land as described in the inquisition, dated the 26th of October, 1818. Levi states, that he was living on the land at the time of this sale. Some of the witnesses testify that the improvement of Levi has always been occupied from the time he commenced it until the present time; that some one always resided on it; this is a fact, of which you will judge for yourselves from the evidence. The question now is presented, how much land, and what land did James buy at this sheriff's sale? Did he buy the improvement of Levi? or did he buy the twelve hundred acres south of the mortgage line? This is a warmly contested point; it is a point of much importance in the decision of the cause, and therefore, the Court brings it very particularly to your notice, as worthy of your patient and careful examination. Michael testifies that all the land was sold by the sheriff to James. He was party and ought to know how much of his land was levied on and sold: did he give in the levy, or know what the levy was on? Was he present when the inquisition was held, or when the sale was made? If he was, he ought to know; if he was not, his knowledge would not be so full, nor would it be entitled to much weight with you. You will recollect that evidence was given that Michael had left the country in the fall of 1817, and that he did not return until after the sale. If you believe that was the fact, what Michael has said on this point would not be very satisfactory. It would go to show that he did not know much about it. You will then take into consideration all the testimony in regard to the time, cause, and manner in which he left the country, and from this make your decision whether he did leave the country before the levy and sale or not. If he was not in the country at the time of the levy and sale, what he has testified to as to the land sold, ought not to have any weight. James testifies that he bought all the land; and that after the sale, and before he got his deed from the sheriff, he called on Levi, who was then residing on his improvement, and told him he bought all the land. Levi testified never heard of James claiming his improvement until out to sell to Crosby in 1829. This would contradict

[*255] *directly. Which of the two do you believe credit is due to the witnesses, is for you to dete and not for the Court. You have seen these two witnesses heard what they have said, and where they do not agree, y must decide between them, and say which of them you will believ

(Schall *v.* Miller.)

The sheriff's deed you will have out with you;—it calls for twelve hundred acres; the lands are not described in it by courses and distances. It calls for lands of Klouser; this land is some distance north of the mortgage line. The plaintiff contends that this deed is for the improvement as well as for the land claimed by the purchase from Moyer. The defendants contend that the deed is not for the improvement, and that it covers no land north of the mortgage line. Which of the parties is right as to the fact, you must decide from the evidence: what land was levied on and sold, whether it was the land south of the mortgage line only, or whether it embraced also the improvement north of it—in the consideration of which you will consider the description in the inquisition and deed, aided by the testimony given by each party on this point. No land but that levied on could be sold, so that the· only difficulty is as to what was thus levied on and sold. This fact the Court must entirely leave to you. The next point worthy of your consideration is this:—If the land was sold to James by the sheriff, has he kept up his improvement and residence on the land since his purchase as the law requires? This is a point about which much has been said. What then are the facts in regard to it? Levi, it appears, was living on the land at the time of the sale. He was a defendant in the proceeding. The land was sold as his property and that of Michael. Levi lived on the land until 1824; he then leased the land to Hummel for five years; Hummel went on the land, and remained there two or three years, and then transferred his lease to one John Miller. Miller remained on the land until the lease expired— this was in 1829. Miller then took a lease for one year from Crosby, and then another year from Brooks. This would bring it up to 1831. Was Levi, after the sale the tenant of James? Did he hold his possession under James's right? Did he thus connect his possession with the right of James? If he did, then the testimony, if you believe it, would prove his residence up to the spring of 1829, by his tenant. You will recollect that Levi testifies that he never heard that James claimed his improvement until 1829. If you believe this, it would tend to· prove, and would prove, that he did not hold possession under James; for it is not probable that he held under James, if he had never heard of his claim to the land; he would not hold under a right if he had no knowledge.

You will also recollect, that James testifies that he called on Levi immediately after the sheriff's sale, and told him he had bought it; that when he heard that Levi had left the land, he took his brother Isaac, and went to Levi, and told him he had heard that he had left the land; that Levi told him it. was all

(Schall *v.* Miller.)

[*256] right; that he had put Hummel *on for him; that he then went to Hummel and told him the land was his. You will also recollect the testimony of Barnhart, and of James taking clover seed to Levi to be sown on the land. Levi also states, that after he had left the land in 1824, that he saw James, and that James said he had heard that he had left the land, and that he was afraid he would lose it. Was Levi the tenant of James, and did he put Hummel on the land for James? If he was the tenant of James, and put Hummel on for him, then the residence would be for his use and benefit, and under his right. If Levi was not the tenant of James, and did not put Hummel on for him, and did not hold for or under him, and had never heard of his claim or right, then James would have failed to keep up his residence according to the requirements of the law; and this would be fatal to the plaintiff's recovering in this suit. There is another point of importance connected with this; and this is, how much and what land did Levi claim by his improvement? Levi states, that he never claimed by improvement south of the mortgage line: that in 1820 he threw off all he had in possession south of the mortgage line, to avoid the payment of taxes; that in 1825 he had his survey made, and did not go further east than to the Schall survey. If Levi never did claim south of the mortgage line by his improvement, then the plaintiff could not recover any land on this improvement south of this line, in this suit. Michael testifies, that when they found out that Moyer's right was not good, that Levi and he then went on to hold the eight hundred acres by improvement, Levi claiming the east four hundred acres. He did not state when it was, but you will say, whether it was not before the levy and sale, for it is agreed on all sides, that Michael did not remain on the land after the sale. If the Moyer right was not good, and this land was vacant, they might go on to hold it by improvement. But did they do this? This is a fact for you; you will decide it. Which of those two witnesses do you believe on this point? If Levi was the tenant of James, and as such holding possession under him, he could not throw off any of the land that he was then in possession of as his tenant, without the knowledge or consent or acquiescence of James, as a tenant cannot thus dispose of the rights of his landlord. If he was not the tenant of James, then he might limit his possession and claim to any quantity and part of the land he thought proper. Then you will determine the fact of residence and possession—whose was the possession—what kind of possession was it—how was it continued from time to time, and for whose, and on what land?—are all facts which the Court leaves you to decide. To constitute a good improvement in point of law, the settlement must be actual

(Schall v. Miller.)

—there must be an actual personal residence on the land, and this actual personal residence must be kept up from time to time with a manifest intention to make it a place of abode. If Levi was not the tenant of James, and James was not in possession of the land from 1818 until 1831, either himself or by his tenant, then *his right would in law be abandoned and lost, and the plaintiff could in that case not recover in this action. [*257] What the possession was, and under whom, you will decide. Another question is, did James in 1829 disclaim all right to this land, or to Levi's improvement? This is also an important question, and requires your careful examination. Levi states, that upon his agreement to sell to Crosby, and before he had made title, he, with Crosby, called on James and told him of the agreement to sell; that James then said that the improvement belonged to Levi; that the rest had all left it; that Levi had stuck to it; that it belonged to him, and that the rest of the heirs of John Blew had no claim to it. James testifies, that when Levi and Crosby called on him in 1829, he told them it did not belong either to Levi, or the heirs of John Blew; that it had belonged to Levi and Michael, but had been sold from them by the sheriff, and he had bought it; and that it was his. Here again you have a direct contradiction. Which of the two is worthy of belief? If you believe Levi, it would amount to a full disclaimer, and would bar the right of James, and all claiming the land from him by subsequent grant, and the plaintiff could not recover. It is not for the Court to say which of the two you will or ought to believe: that is your duty, and as such is left to you. You also have in evidence on this point, the paper dated the 11th of May, 1829, purporting to be signed by James, his mother, and Andrew. Is the name of James, which is placed to this paper, his own handwriting? It is not pretended that it was signed by any other by his authority or direction: it is insisted upon, that it is his own handwriting. Esquire Reber testifies that the body of the paper was written by him; that he signed his own name to it, but that he does not recollect that James was before him. He states that the name of James Blew is in the handwriting of James Blew. James testifies that he has no recollection of signing it; that it looks like his handwriting; that it is a little smoother and lighter than his; that he could not say it was not his, but for the fact, that at the time of its date he was resisting the claim of Crosby, and directing his tenant to keep him off the land, which he did. James also testifies, that when he was examined on the former trial, he did not say that he had made an affidavit before Esquire Reber: that what he did state was, that they wanted him to do it, but that he had not done it. In this he is contradicted by both Mr. Loeser and

(Schall *v.* Miller.)

Mr. Bannan; they testify, that on the former trial James did say that he had made an affidavit before Esquire Reber. They have produced their notes of his testimony as then taken, and it is there written down as they have now sworn. This is certainly strong testimony. James now insists, that they misunderstood him. If James did state as Mr. Loeser and Mr. Bannan have sworn, it would contradict him so directly, and that *too* on a point so material, that but little reliance could be placed on his testimony. But still the fact, did he so testify, is left for you to [*258] decide. *If he was misunderstood, and you are satisfied of that fact, it ought not to detract from his credit. We have his testimony: will the testimony in regard to this part of the case be believed? It is for you to say whether you believe James Blew, or whether you believe the other witnesses. In weighing James Blew's testimony, you will take into consideration the contradiction as proved by Ridgway, Loeser and Bannan, as to what he means took place in their presence. This is important. You will recollect—the Court need not repeat it—he swears positively that it did take place; they swear as positively that no such conversation did ever take place. Andrew states that on one of the occasions he was present, and states the same that James does. Then do you believe James and Andrew, or do you believe the other witnesses? One or the other of the two sets must be grossly mistaken, to say the least of it. You have seen and heard the witnesses, and you will be able to say which of them are witnesses of truth. You will, in weighing the testimony of each witness, take into consideration the contradictions as proved against him. This will apply to each witness that is contradicted. If a witness is proved to have been false in a material point, and you are satisfied that the falsehood was wilful, then no reliance should be placed on his testimony, when it stands alone and unsupported. No fact should be taken as proved by the testimony of such a witness, unless it is corroborated or supported by other proof, either direct or circumstantial. You will then decide the facts. In doing this, you must determine which of the witnesses is entitled to credit. There is much contradiction—you will reconcile it if you can. If you cannot reconcile it, then you must determine which is worthy of belief, and which not. This is so peculiarly your duty, that the Court forbears giving any opinion, or even intimation in regard to it. If the land in dispute was vacant at the time Schall took out his warrant, then the plaintiff cannot recover. You must be satisfied from the evidence, that the land in dispute was held by the improvement of Levi; that it was levied on and sold by the sheriff to James; and that he kept up the improvement by residence on the land; otherwise the plaintiff cannot recover; for if you find

(Schall *v.* Miller.)

any one of these points against the plaintiff, it would be fatal to his rights, and he could not recover.

Before answering the defendant's points, we will draw your attention to the warrants and patents in relation to which we are requested to charge you.

The defendants have given in evidence,

1st. A warrant to John Schall for one hundred and twenty acres, dated the 4th of August, 1824, as for vacant land. A survey on this warrant of 195 acres, dated the 9th of September, 1824.

Patent for the same, dated 7th of April, 1825. Deed from Schall *and wife to the Cressons for the same land, dated the 1st of December, 1828, for $1656. [*259]

2nd. The application of Crosby on Levi Blew's improvement, dated the 4th of March, 1829. Warrant for the same dated the 7th of March, 1829, for one hundred and eighty acres. Survey dated the 14th of May, 1829, of fifty-two acres and one hundred and twenty-nine perches.

Deed of Levi Blew and wife to Neal Crosby, dated the 26th of March, 1829, for one hundred and eighty acres. Deed, Crosby to Schall and Ridgway, dated the 12th of May, 1829.

Patent to Schall and Ridgway, 15th of June, 1829.

Deed, Schall and Ridgway to the Cressons, for three-fourths of the land, dated the 26th of June, 1830, for $1680.

Deed from Schall and Ridgway to Aaron Eberly, for one-fourth of the land, dated the 25th of January, 1830, for $560.

3d. The plaintiff's warrant is dated April 25th, 1835, and is for four hundred acres.

Answer to the defendants. 1st point :—If Levi Blew, at the time he had his southern line made in 1820, and his survey in 1825, and at the time of his sale to Crosby, was the owner of the improvement made by him, then no second warrant could legally be granted for the land granted by the warrant given in evidence by the defendants, nor could any other warrant be legally granted on the improvement of Levi Blew; and in that case the plaintiff's warrant would be void. But if the improvement of Levi Blew was on and for four hundred acres, and the land granted to the plaintiff by his warrant, and that improvement and the land claimed thereby was sold to James Blew by the sheriff; and James Blew kept up the settlement and residence on the land; and if Levi was his tenant after the sheriff's sale, up to the time he left the land, and put Hummel on ; and if he put Hummel on the land for James, the warrant granted on the application of Crosby for Levi's improvement, and survey thereon of fifty-two acres and one hundred and twenty-nine perches, would not prevent the plaintiff from taking out a warrant on this

improvement for the four hundred acres claimed by the improvement; and in that case his warrant would not be void.

If the plaintiff could not take out his warrant on his improvement, how could he get his title for the land not granted by the Crosby warrant? That warrant covered the land on which Levi resided—when this was cut off, no residence had been made on the residue. If he was obliged to take up the land as vacant, that would oblige him to abandon his improvement, and his right would then take precedence but from the time he would make this application, which would be unjust, as he might thus lose his right to the land. If the plaintiff has the right to the land, the warrant and patent, on the application of Crosby, would be for [*260] his use, but this trust would not *be beyond the fifty-two acres one hundred and twenty-nine perches surveyed and patented; so that to recover the rest of the land he might take out a warrant on the improvement for the whole of the four hundred acres; and in this case the warrant of the plaintiff would not be void.

Answer to the second point. On what land the improvement by virtue of which the plaintiff claims title was made, is a fact for the jury to determine. The plaintiff might locate his warrant by survey on vacant land, without attaching it to all the adjoiners called for on it. But if the jury believes that Levi's improvement was bounded on the south, east, and north by official surveys well marked on the ground, and that those lines were claimed to by him before and up to the sheriff's sale to James as his boundary, and also by James after his purchase; and that the plaintiff's warrant calls for the same land, on which the improvement was made, and this suit is brought to recover land which was claimed by the improvement and on which it was made, then the plaintiff can recover without a survey made on the ground, although there might be other vacant land there on which he might locate his warrant, without interfering with any part of the land in question in this suit.

We answer to the third point, as requested therein.

Answer to the fourth point. The patent for the Levi Blew improvement, and for the land now in question having issued, and the titles from the patentees to the Cressons having been recorded prior to the date of the plaintiff's warrant in 1835, would be notice to him of their existence. But whether the plaintiff acquired title to the land in question under his warrant, depends upon whether an improvement was made on the land in question prior to the defendant's warrant for it, and whether the plaintiff has shown himself to be the owner of that improvement, and whether on his part and those under whom he claims, such actual residence on the land, as is required by law,

(Schall *v.* Miller.)

was made and continued from time to time, as we have stated to you in another part of our charge.

Answer to the fifth point.   The Court charge the jury as requested in this point.

Answer to the sixth point.   If James Blew did purchase the improvement land in 1818, and neither himself nor Anthony F. Miller took any steps to perfect the improvement right, and during all that time suffered Levi Blew and those claiming under him to be in possession, and in 1825 or 1826 Levi had a survey made circumscribing the improvement lands, excluding the land in question, and the title to that improvement was afterwards perfected under Levi's improvement, by official survey and patent from the commonwealth in 1829, still excluding the land in question, the plaintiff could not now extend the boundaries of that improvement beyond the boundaries of the patent so obtained. But the question recurs, did James take steps to perfect the improvement if he did buy it?   Was Levi his *tenant?  [*261] Did Levi put Hummel on the land as the tenant of James? for if Levi was the tenant of James, and in possession of the land under him, he could not sell the land nor any part of it, nor could he throw any part of it off so as to affect the right of James, unless James did assent to, or acquiesce in such sale, or throwing out part of the land, or concealed or disclaimed his right to it.   How the facts are in regard to these matters is for you to decide from the evidence.

Answer to the seventh point.   The Cressons claim under an original title; by that title they had notice that the right to the land was as vacant land.   They were bound to know whether the land was vacant or improved at the time their warrant was obtained.   If James Blew had a right to the land under the sheriff's sale, by virtue of the improvement of Levi Blew, that right could not be divested by the officers of the land office granting a warrant and patent to Schall, nor would it being sold to the Cressons for a valuable consideration, vary the case; this would not defeat the improvement right of James, if it was *bona fide* made and he had not been guilty of negligence, whereby the Cressons, as innocent purchasers for a valuable consideration, had been injured: beyond this the Cressons cannot be affected by any secret agreement or acts of which they had no notice.   The Cressons would not be affected by the verbal agreement between James and his brothers about this land, from the proof which has been given.

Answer to the eighth point.   The Court charge as requested in this point."

The defendant's counsel excepted to this charge; and the jury

(Schall *v.* Miller.)

having found for the plaintiff, the record was removed to this Court, and the following errors assigned.

"1. The Court erred in admitting the evidence as set forth in the first bill of exceptions.

2. The Court erred in admitting the evidence as stated in the second and third bills of exceptions.

3. The Court erred in rejecting the evidence as set forth in the fourth and fifth bills of exceptions.

4. The Court erred in rejecting the evidence as set forth in the sixth bill of exceptions.

5. The Court erred in their answer to the first point submitted by the counsel of the defendant below.

6. The Court erred in their answer to the second point sub[*262] mitted *by the counsel of the defendants below, and in submitting to the jury facts of which there was no evidence.

7. The Court erred in their answer to the fourth point submitted by the counsel of the defendants below.

8. The Court erred in their answer to the sixth point submitted by the counsel for the defendants below.

9. The Court erred in their answer to the seventh point submitted by the counsel for the defendants below.

10. The answer of the Court to the eighth point submitted by the counsel of the defendants below, is at variance with the body of the charge.

11. The Court erred in charging the jury, that the improvement upon the land could be kept up by Levi Blew and those who were in possession under him, for the benefit of James Blew; and that James Blew and the present plaintiff are not affected by the acts of Levi Blew, while in possession, in circumscribing the claim under the improvement right."

Mr. *W. B. Reed* and Mr. *Mallery*, for the plaintiffs in error, cited *Robinson* v. *Justice*, (2 Penn. Rep. 19); *Cresson* v. *Miller*, (2 Watts, 279); *Richardson* v. *Stewart*, (4 Binn. 198); *Drinker* v. *Hunter*, (2 Yeates, 129); *Acre* v. *Lauby*, (3 Penn. Rep. 305); 2 Smith's Laws, 103–4.

Mr. *Hoffman* and Mr. *Greenough*, (with whom was Mr. *Davis*,) for the defendant in error, cited *Blair* v. *M'Kee*, (6 Serg. & Rawle, 189); *Overfield* v. *Christie*, (7 Serg. & Rawle, 173); *Muckle* v. *Lucas*, (10 Serg. & Rawle, 293); *Barton* v. *Glasgow*, (12 Serg. & Rawle, 149, 153); *Cooper's Lessee* v. *Galbraith*, (MS.); *Schwartz* v. *Moore*, (5 Serg. & Rawle, 257); *Moore* v. *Buchanan*, (10 Serg. & Rawle, 275); *Welsh* v. *Crawford*, (14 Serg. & Rawle, 440).

(Schall *v*. Miller.)

The opinion of the court was delivered by

HUSTON, J.—The charge of the president of the Common Pleas, states the facts and the points on which his opinion turns, so fully and distinctly, that I prefer that this shall be given as the statement of the case, to going through the labour of again stating it. It is true, that every minute particle of testimony is not given by the judge, but the plaintiff in error is not injured by any omission.

I will then proceed to notice the bills of exceptions to testimony.

The plaintiff below deduced his title through a sheriff's sale by *which the land in question was sold as the property of Levi Blew and Michael Blew; and offered in evidence [*263] the record of a judgment at the suit of John Hughes against Levi Blew, Michael Blew, and John Adams, in which suit the execution issued on which the sale was made. This was objected to, as being a suit between other parties. Now this matter has been so often decided, that it ought to be at rest—indeed, it was not urged here. A sale by a sheriff is a well known mode of transferring title : and as the whole suit, judgment and execution from the authority of the sheriff to sell, it is settled that they must be produced : and this, and the record of the acknowledgment of the deed in open Court, by the sheriff, are and must be evidence of the transfer of the title of the defendant in the judgment to the purchaser; or no purchaser could have any written or record evidence of title by the sheriff's sale. It concludes nothing as to the matter trying, except that the title which was once in Levi and Michael Blew, was transferred, in due form of law, to the purchaser at that sale.

The land sold was described as bounded by several persons named. The property sold was held by improvement; and several witnesses proved that it was bounded by lands held by the persons called for as adjoining. The warrants and surveys of some of the adjoining lands, and the survey of one tract under seal were offered, not as showing title in the plaintiff below, but as showing the boundaries; these were objected to ; but were admitted for the purpose for which they were offered. This was also almost waived here, except as to the survey on which no warrant was shown. Now it was not necessary to show any of the warrants. It was perfectly immaterial whether the title of those people was good or bad; it was the fact that the land in question adjoined them, which was to be proved, it was perfectly immaterial whether the adjoining claimants held by good and perfect titles, or by defective titles. This matter was considered in *Vickroy* v. *Shelly*, (14 Serg. & Rawle, 372); and *Lambourne* v. *Hartswick*, (13 Serg. & Rawle, 113,) expressly

(Schall *v.* Miller.)

decides this matter. The deposition of Michael Blew had been taken; objections were made to parts of this, and some rejected. Of the part admitted, some were excepted to, viz. the witness had been describing the lands held by himself and Levi, before the sale, and was asked whether all these lands or what part of them was sold by the sheriff. The witness answered: " I was living on the vacant land : supposed it to be sold and moved off. I understood the judgment of John Hughes was against our improved lands, and was sold and did not reach to pay it: and also, part or the whole of Adams's land was sold for the balance. I understood it from Levi himself. After the sale I saw James, he came there. The way I understood was, that James had bought the land. I moved off, and in two or three years, I came back; Levi was then on the land." And again, " I was living [*264] at Muncy two *or three years after, and Levi and Adams came to my house, I asked him about the land; he said John Hughes had sold the improved land, and James Blew had bought it, and part of the Adams tract too, and the mortgagee had sold the mortgage land, and so it was all gone."

The objection to this was, that the levy, inquisition, and sheriff's deed would show this, and not parol evidence. Now, the sheriff's deed was proved to be lost, and the levy and inquisition were afterwards given in evidence, which waived this objection. The levy, however, was very indefinite; but the inquisition, which was part of the return, specified the boundaries on the west, north, and two on the east, one of which adjoined the land in dispute, and stated the quantity as twelve hundred acres more or less. Now, where the levy is vague, it has been decided that parol evidence of what was said and understood by the defendant and others at the sale may be proved. *Moore* v. *Buchanan,* (10 Serg. & Rawle, 275,) and *Schwarts* v. *Moore,* (5 Serg. & Rawle, 275). As to what Levi told him, it was abundantly in proof that Levi continued on the land until 1824 ; whether as James's tenant or not, was disputed. The defendants claimed part of the land in dispute under a deed from Levi, dated 1829. Now what a man says while he claims to be owner, or admits himself to be a tenant, and is living on the land, is evidence. In another point of view :—There had been a former trial as to part of this land, and Levi had been examined and was called by the defendants five times in this trial. When this deposition of Michael was taken, it was for the purpose, among other things, of giving an account of these transactions differing from Levi's statement. The plaintiff knew what had been proved by Levi, and he expected would be said by him again ; and the deposition was composed of all he could say ; it must be put in one deposition ; not possible to divide it as Levi's evidence

(Schall *v.* Miller.)

was divided, and he called in to swear as the several points arose. If the whole of Michael's deposition had not been read at once, it must have been all admitted in an after-stage of the cause; but it all went to strengthen the plaintiff's title in chief, and there was no error in admitting it then; or if there was at the time, as to Levi's statements, it was made legal by the defendants' afterwards showing that they claimed under Levi as an owner, and the claimant residing on the land at the time he made these statements to Michael. Testimony is frequently received because it is stated that it will appear to be legal and pertinent, by what must come out in the cause; and if what is stated to be the facts, which will make it legal, are proved as stated, there is no error. I have known a plaintiff after showing his own title, proceed to show that the defendant's title was bad, before the defendant had opened his case, or given any evidence. This is wrong; and ought to be discouraged. But it was considered necessary to show the extent of James's purchase, and how the defendants, whose land was sold, understood and admitted *it to be. It was also supposed to be necessary to prove that James continued and kept up the improve- .[*265] ment. The declarations of the defendant whose right had been sold, and who still continued on the land, stating that all had been sold, and bought by James, were, together with the act of assembly, for obtaining possession by the purchaser at sheriff's sale by three months notice, and proceeding as if the defendant whose land was sold, was his tenant; these declarations, I say, were evidence to go to the jury, to prove the continuance of the improvements by Levi, who acknowledged the right of James, and who was liable to be turned out by James, on three months notice.—I may refer to this subject again.

The next bill of exceptions has been argued here on the principles above stated, viz.: was it evidence in the case as it stood when the evidence was offered, or was it evidence on the whole of the case as it now appears? On the whole case, it is an important question, whether Michael lived on the land when it was sold on the execution at the suit of Hughes; at least so it was considered by the Court of Common Pleas in the charge to the jury. We never have before us the opening of the counsel, and we can only conjecture what it was, from what is proved, or offered to be proved.

Some witnesses had been examined to prove that Michael Blew had removed from Schuylkill county in the fall of 1817; that is, a year before the land of Levi and Michael Blew was sold to James Blew by the sheriff. But other testimony was considered advisable,. and Jacob Seitsinger was called, who testified as follows: "I signed the receipt on this execution: the second of

(Schall *v.* Miller.)

November, 1817, is the date of the execution. David Philips against Michael Blew. It appears to me, that Philips had gone after Michael, but I am not certain. The execution is in the writing of Esquire Kribs." The receipt was, that he, Seitsinger, had received his costs on that execution, but did not state from whom he had received them ; nor the amount received, nor when : there was no date to the receipt. The defendants then offered the execution, of date of the 2nd of November, 1817, David Philips against Michael Blew, in evidence, having proved the handwriting of the justice who signed it. This was objected to, and rejected ; and this is the fourth bill of exceptions. It sometimes occurs that a matter is offered in evidence, of which it is not possible to say what it may tend to prove, or may not tend to prove ; and for the admission or rejection of which, a proceeding ought not to be reversed. The record of the suit in which it issued was not produced ; there was no endorsement of a levy on it ; no return to the justice on it ; nothing to show or lead to a conjecture that it had been ever returned to the justice who issued it ; nothing to show that Michael Blew was not found by the constable to whom it was directed ; nor to show that Michael Blew did not pay Seitsinger his costs ; and after turning it carefully in my *mind, I cannot say it proved, or tended to prove, any thing in this case.

[*266]

The next offer was of a transcript of a suit of Andrew Krommas against Levi Blew and Michael Blew, to appear on the 24th of January, 1818, before — Kribs, Esq., to answer a demand of debt, for services rendered under $100. The constable returned on oath "summons served ;" the defendants not appearing (summons was only served on Levi Blew) judgment for plaintiff by default for $2 43. On the 31st of January, execution to D. C. Seitsinger, (not the one sworn above ;) "Seitsinger paid debt and justice's fees." This is a full statement of the paper offered, except the certificate of Justice Henry Stager, that it is a full and true copy of the docket of Justice Kribs, which was left with the subscriber when Kribs went to the legislature ; this, under the hand and seal of Henry Stager, a justice of the peace. The same objection exists as to receiving this paper. If the constable had returned that Michael Blew was not to be found, there would be some colour for saying there was a presumption that he had left the county ; but that a summons for two dollars was not served on two defendants, was no ground for a presumption of his having left the county. The constable might have been called to prove why it was not served. Besides, it has been decided by this Court, that a transcript under the hand and seal of a justice, is not evidence, except in the cases and for the purposes in which it is directed by act of assembly.

(Schall *v.* Miller.)

The defendants then offered to show that David Bright who had purchased the land, or some of it, under a sale made on a mortgage given by old John Blew on the land sold him by Moyers, made a deed to Moses Jaques; that that deed was taken from Henry Bets by Anthony F. Miller, the plaintiff, and cancelled, and a new deed made from David Bright to William Bricker and Anthony F. Miller, dated 11th February, 1830; and to show that Anthony F. Miller claimed the land on that deed before he bought from James Blew. This parol proof was rightly rejected: because if the plaintiff bought a defective title, and afterwards bought a good title, he may recover and hold on such good title. And because there was no notice to the plaintiff to produce these deeds, without which no parol evidence of their contents could be given.

After the testimony was closed, the defendants submitted certain points of law on which they requested the Court to charge the jury—

"1. A warrant, survey, and patent, having been issued on Levi Blew's improvement, no second warrant could legally issue on the same improvement and settlement right, and therefore the warrant of the plaintiff is void." To this the Court said,—"If Levi Blew at the time he had his southern line made in 1820, and his survey in 1825, and at the time of his sale to Crosby, was the owner of the improvement made by him, then no second warrant could legally *be granted for the land covered by the warrant given in evidence by the defendants; nor could [\*267] any other warrant be legally granted on the improvement of Levi Blew; and in that case the plaintiff's warrant would be void. But if the improvement of Levi Blew was on and for four hundred acres, and on the land granted to the plaintiff by his warrant, and that improvement, and the land claimed thereby, was sold as the property of Levi Blew, by the sheriff, to James Blew, and James Blew kept up the settlement, and residence on the land, and if Levi was his tenant after the sheriff's sale, up to the time he left the land, and put Hummel on the land for James, the warrant granted on the application of Crosby, for Levi's improvement, and the survey thereon of fifty-two acres one hundred and twenty-nine perches, would not prevent the plaintiff from taking out a warrant on this improvement for four hundred acres claimed by the improvement; and in that case the plaintiff's warrant would not be void. If the plaintiff could not take out his warrant on his improvement, how could he get his title for the land not granted by the Crosby warrant? That warrant covered the land on which Levi had resided; if this was cut off, no residence had been made on the other part; if he had no residence on the other

(Schall *v.* Miller.)

part, he would have been· obliged to take up the other part as vacant; that would oblige him to abandon his improvement, and his right would then take precedence only from the time he would make his application, which would be unjust, as he might thus loose his right to the land." There was no error in this. The act of 30th of December, 1786, says, " no warrant shall issue from the land office of this state for any tract of land on which a settlement is made, unless to· such person or persons, respectively, who have made the settlement, or their legal representatives, until the 10th day of April, 1789; and if any such warrant shall issue, otherwise than as aforesaid, it shall be deemed to have issued by surprise, and shall be· of no avail in law." Acts of assembly have passed up to this time, entitled generally, acts to extend the time for patenting lands; and in our digests the title alone is often given, but they contain a clause giving a right of pre-emption to actual settlers, to obtain warrants for their lands; and have been in force, and are in force to this time. Rights thus acquired, and sanctioned by the legislature, are, and have for many years been considered in Courts, equal in all respects, except as against the state, and as on the same footing with what is called perfect titles : they descend and are transferred as other titles to land; are bound by judgments, and mortgages; and the title passes by judgment, execution and sheriff's sale, and becomes absolutely vested in the purchaser at such sale, and the whole interest of the person who was defendant in the judgment and execution is transferred. The words *legal representatives* in the above law have always been applied to designate those to whom the property was legally conveyed, whether by operation of law or by deed. [*268] If, *then, the land in question was part of Levi's improvement, and was sold to James, and he had not sold, or in some way lost his right, Levi had no title which would give any right to Crosby; and Crosby not being the legal representative of the improver, his warrant, survey and patent, are, in the words of the act, invalid in law. A warrant, survey and patent obtained contrary to law, do not, and never have availed in this state, if they come into collision with him who has a right; if he does not contest them, generally, a third person cannot. Though in *Bixler* v. *Baker,* (4 Binn. 213,) a stranger who sat down on land as vacant, held it against a warrant, survey and patent, obtained by fraudulent misrepresentations at the land office.

The answer to the second point is as follows : " On what land the improvement by which James claims was made, is a fact for the jury to determine. The plaintiff might locate ·his warrant by survey, on vacant land without attaching it

(Schall *v*. Miller.)

to all the adjoiners called for.  If the jury believe that Levi's improvement was bounded on the south-east and north by official surveys, well marked on the ground, and that those lines were claimed to by him, before and up to the sheriff's sale to James, as his boundary, and also by James after the purchase; and that the plaintiff's warrant calls for the same land on which the improvement was made; and that this suit is brought to recover land which was claimed by the improvement, and on which it was made; then the plaintiff can recover without a survey made on the ground, although there might be other vacant land on which he might locate his warrant, without interfering with any part of the land in question in this suit."

There is no exception to the answer to the third point.

The answer to the fourth point is,—" The patent for the Levi Blew improvement, and for the lands now in question having issued, and the titles from the patentees having been recorded prior to the sale of the plaintiff's warrant in 1835, would be *notice to him of their existence*.  But whether the plaintiff acquired the title to the land in question under his warrant, depends upon whether an improvement was made on the land in question prior to the defendant's warrant for it, and whether the plaintiff has shown himself to be the owner of that improvement; and whether, on his part and those under whom he claims, such actual residence on the land as is required by law, was made and continued from time to time, as we have stated to you in another part of the charge."

The fifth point was not objected to.

The sixth point is answered thus :—" If James Blew did purchase the improvement land in 1818, and neither himself nor Anthony F. Miller took any steps to perfect the improvement right; and during all that time suffered Levi Blew and those claiming under him to be in possession, and in 1825 or '6, Levi had a survey made circumscribing the improvement lands, and excluding the land in question *and the title to that improvement was  [*269] afterwards perfected under Levi's improvement by warrant, survey and patent from the commonwealth in 1829, still excluding the land in question, the plaintiff could not now extend the boundaries of that improvement beyond the boundaries of the patent so obtained.  But the question recurs, did James take steps to perfect the improvement, if he did buy it?  Was Levi his tenant?  Did Levi put Hummel on the land as tenant of James? for if Levi was the tenant of James, and in possession of the land under him, he could not sell the land, nor any part of it, so as to affect the right of James, unless James did assent to or acquiesce in such sale, or such throwing out part of the land,

(Schall *v.* Miller.)

or concealed or disclaimed his right to it.    How the facts are in regard to these matters, is for the jury to decide from the evidence."

The answer to the seventh point was, " The Cressons claim under an original title : by that title they had notice that the right to the land was as vacant land.   (This applies to the John Schall warrant.)   They were bound to know whether that land was vacant or not at the time that warrant was obtained.   If James Blew had a right to the land under the sheriff's sale of the improvement of Levi Blew, that right could not be divested by the officers of the land office granting a warrant and patent to Schall ; nor would its being sold to the Cressons for a valuable consideration vary the case.   This would not defeat the improvement right of James, if it was *bona fide* made, and he had not been guilty of negligence, whereby the Cresson's as innocent purchasers for a valuable consideration, had been injured ; beyond this, the Cressons cannot be affected by any secret agreement of which they had no notice.   The Cressons would not be affected by the verbal agreement between James and his brothers, about this land, from any proof that has been given."

I have taken these together, because they were argued together before us, and because, although perhaps not identical, they are a good deal dovetailed into each other.

The first question is, whether a person having a valid subsisting right by improvement, and who is disseised, or in any way loses the possession, can support an ejectment, though he has no survey of his lands ?   When it is once admitted, that an improvement duly made and continued vests a right, it would seem to follow, that if the owner was disseised by force or fraud, or accident, he must have a right to recover the possession ; and if a right to recover possession, he must have a right to recover the possession as he had it at the time when it was taken from him, whether by force or fraud.   Land covered with timber in a wilderness is reduced to cultivation, by much toil, continued for a series of years.   The law allowed the settler three hundred acres before the revolution, and four hundred acres since, if so much was vacant.   On all the farms in this state there was left at first some woodland, from necessity, and the impossibility of clearing [*270] the whole in a short time ; and also *from motives of utility and convenience, as a place from whence to obtain timber and firewood.   It seems strange, that it could ever have been supposed, that if you turned a settler so situated out of possession, he could recover from you only the houses and cleared land, and you should keep the whole of the uncultivated land as a premium for your iniquity in dispossessing him.   The case of *Elliott's Lessee* v. *Bonnett,* (3 Yeates, 287,) supports all the

(Schall *v.* Miller.)

judge said here. Croyle had set down on a tract of land on Snake Spring, in 1754, and continued until every body fled from that country after Braddock's defeat; he was among the first to return after the peace in 1761. In his absence a survey had been made, including a great part of his claim, in pursuance of some order of the secretary of the land office; and this survey was returned into the land office. In 1762, after Croyle had returned to the land, he sent his son with the money to procure a warrant for three hundred acres. The son insisted on a warrant on three successive days, and at last was permitted or persuaded to take a warrant for one hundred acres only, to include the mouth of Snake Spring, where his father had a sugar camp, and which was not included in Croghan's survey. Old Croyle was angry—continued in his house, and extended his improvements, and said he would complain to William Penn; but at length had a survey on the one hundred acre warrant made in 1768, of one hundred and twenty-three acres one hundred and twenty-three perches; and in 1767, applied for two hundred acres to adjoin his warranted land and his improvement, and had it surveyed. In the meantime, in 1763, George Croghan obtained a warrant of acceptance, reciting, that "*by our consent* and direction, there was surveyed by John Armstrong in 1755, a tract on Snake Spring, containing three hundred and ninety acres one hundred and eleven perches, for which he hath agreed to pay £15 10*s.* per one hundred acres, and interest from the 1st of March, 1755," and requiring the survey to be accepted and returned to the secretary's office, that a patent might issue. George Croghan sold to John Litle, who brought an ejectment in Cumberland county, before Bradford county was erected; this lay over till 1788. In 1774, Croyle sold to Elliott his three tracts, the warrants, location, and improvement, which included Snake Spring, and covenanted that he would prove that his improvement was made anterior to any other claim. In 1788 the ejectment in Cumberland county was tried without any notice to Elliott, and Litle recovered the land, took possession, and conveyed to Bonnet. This ejectment was by Elliott, to recover the land to which he was entitled by virtue of Croyle's improvement, and which was included in Croghan's survey, which had become the property of Bonnet. Elliott recovered. Croyle nor he had any boundaries fixed or designated with certainty, and the jury were directed to designate on the draft in what *shape it should be, under the direction of the Court. The jury [*271] gave him as much as with his one hundred and twenty-three, made three hundred acres. This case, then, proves, that there may be a recovery on an improvement title, not only without a survey, but without the boundaries having been very precisely

(Schall *v.* Miller.)

designated. Bonnet brought another ejectment, and a decision on it is to be found in *Bonnett* v. *Devebaugh,* (3 Binn. 175,) a case well worthy the perusal of a lawyer. The other cases cited show that this doctrine in firmly settled in this state. I will also add a reference to *Davis* v. *Kerper,* (4 Binn. 161); *Blair* v. *M'Kee,* (6 Serg. & Rawle, 193,) and *Burton* v. *Glasgo,* (12 Serg. & Rawle, 149,) as stating principles applicable to this case.

The phrase "took any steps to perfect the improvement," was used by the counsel in this cause, as if it was supposed, he who bought an improvement right was bound to file an application or take a warrant. I have shown that the legislature have not required the owner of an improvement right to take a warrant; if he continues the possession and cultivation by himself, or by a tenant, he does all the law requires.

The seventh point seems to refer to the part held by the defendant under Schall's warrant. To say nothing of the manner of obtaining the warrant by the oath of a man who knew nothing about it; nor a survey made by moonlight including another man's fields, the cases cited above of *Bixler* v. *Baker,* and *Elliott* v. *Bonnet,* together with those cited by counsel, show that, unless the improvement right was abandoned, this Schall warrant, survey and patent are, as against the improver, totally invalid in law.

The counsel of the plaintiffs in error have complained that the Court have not answered the propositions submitted by them in the terms proposed; or if the judge did so, he added some reference to the facts of the case which made the answer different from what a direct affirmative or denial of their proposition would have been. To settle abstract propositions is sometimes the business of a Court; but this is not often the case. The general principles which govern are seldom disputed; but the questions which arise in the Court are generally,—what are the facts? what has been done, or not done, by the one or the other? —and force or fraud, or laches, or any one of the infinite varieties in the transaction of human affairs, may, and very often does take a case out of a general rule, or make it an exception to the rule; and it is the duty of the judge, after stating the general proposition, to state, if the case requires it, what will prevent the rule from being applicable to the case trying; or if the facts are disputed, to tell the jury how the law will be, if facts are found to be in one way; and how if found the other way.

The defendants, somehow, in stating their propositions omitted to ask how the law would be, if Levi, after the sale by the sheriff, became the tenant of James, and when he removed put Hummel [*272] in *as the tenant of James. This was too important to the right decision of the cause, to be omitted by a judge

who wished to discharge his duty to both parties. The plaintiffs in error have no cause to complain of the charge.

The exact relation in which a defendant who is in possession when his land is sold, stands to the purchaser at sheriff's sale, has not, perhaps, been in all cases settled. If the defendant has a tenant on land when it is sold, that tenant must pay all rent subsequently due to the purchaser—that is, he becomes the tenant of the purchaser—if the defendant in the judgment and execution is himself in possession at the sale, the purchaser may turn him out on three months notice, as if he were a tenant whose lease would expire at the end of three months. The purchaser may do this immediately after receiving his deed; but he may do it a year after, and if the defendant continued in possession, I do not know that he may not do it at any future time; at least any time within twenty-one years; I mean when no subsequent dealing or agreement has occurred between them. This matter has not been discussed much here, and does not arise so as to require an opinion, and I desire to be understood as not giving one on it.

The majority of the Court, however, are of opinion there was error in rejecting the execution which was the subject of the fourth bill of exceptions: and for this cause alone the judgment is reversed.

Judgment reversed, and <em>venire de novo.</em>

Cited by Counsel, 10 Watts, 15, 150; 7 Barr, 97; 1 Harris, 467; 8 Id. 58.